LORI ANN NYE, APPELLEE, v. GEORGE WAYNE NYE, APPELLANT.

329 N.W.2d 346

Filed January 21, 1983. No. 82-045.

Donald B. Fiedler, for appellant.

Hurt, Gallant & Flores, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

HASTINGS, J.

George Wayne Nye, the respondent-appellant, has appealed from an order of the District Court which denied his application for modification of a marriage dissolution decree. He had requested custody of the minor children of the parties. His principal assignment of error is that the decision of the trial court was contrary to law and the evidence. He also complains of the fact that the entire amount of the fee awarded to the guardian ad litem was taxed to him.

On October 6, 1978, the marriage of the respondent and of Lori Ann Nye, the petitioner, was dissolved. The custody of the minor children, Johnny, born October 14, 1973, and Leonard, born January 11, 1977, was granted to the petitioner. This is the second application for change of custody which has been filed by the respondent.

The first application was filed in May of 1980, and a hearing was held on August 1, 1980. Without reviewing the evidence in detail, it is fair to say that it adequately supports a finding that the petitioner, Lori Ann, was not at that time a fit and proper person to have custody of the children. As a matter of fact, the maternal grandfather and stepgrandmother, Leonard and Anna Strand, had commenced guardianship proceedings in August of 1979, and had had the actual physical custody of the children since at least that time. Mrs. Strand testified that the respondent was not notified of that proceeding because, even though she had inquired of the respondent's mother, she did not know where the respondent

was then living. She also insisted that from shortly after the date of the decree in October of 1978 to the present time, the respondent had had no contact with the children, had never called them on the phone, and had not sent any gifts. She did say that the respondent's mother had inquired about the children on many occasions.

According to the testimony of the respondent at this first hearing, he admitted that his mother had taken the children from their home in Scribner, Nebraska, down to St. Louis, Missouri, in June of 1978. He followed them down the next month. He said that no notification was given to Lori Ann or the Strands that the children were going to be taken to St. Louis. According to the respondent, he did not return the children to Nebraska voluntarily even though he knew of the court's order of August 8, 1978, awarding temporary custody to the petitioner. It was not until sometime in November of 1978, as testified to by the respondent, that the petitioner was able to locate him and the children, with the aid of a private investigator, and he surrendered the children upon order of the police.

It also developed at this first hearing that although the respondent had been ordered by the court to pay child support of $25 per week per child, he had paid but $650 voluntarily. As a part of the August 1, 1980, hearing, he was held in contempt of court and ordered placed in the custody of the sheriff until he had purged himself by payment of all support and costs in full. He complied with that order by the payment of $4,100 on August 12, 1980. During the period of time that he had been failing to make child support payments he had spent $2,650 in legal fees in an attempt to gain custody of the children.

It was on the basis of the foregoing record that the District Court entered an order dated August 4, 1980, finding that neither the petitioner nor the respondent was a fit and proper person to have the custody of the children, and ordered legal custody placed in the

court with physical custody awarded to the Strands. No appeal was taken from that order.

In his petition for change of custody filed in July of 1981, the respondent alleged as a change of circumstances that he was now maintaining his support payments on a regular basis. In addition, he alleged his moral fitness, that by reason of his younger age he was better equipped to raise the children than were the grandparents, and that by law his parental rights were superior to those of the grandparents. Hearing was held on that application in October of 1981.

The evidence adduced at that and earlier hearings generally supported the respondent's claim that he had paid his child support regularly and had obtained and exercised rights of visitation. There was no evidence of the moral or physical unfitness of either the respondent or of the grandparents. The home study evaluation of both homes was quite satisfactory.

However, one rather disturbing factor which had occurred prior to the August 1, 1980, hearing was brought out in these later hearings. That had to do with another effort at self-help on the part of the respondent. He testified that, acting upon the advice of a St. Louis lawyer, he came up to Nebraska in October of 1979 and, without telling anyone, took the children from the babysitter and removed them to St. Louis. At that time he knew that the Strands were actually taking care of the children because he had visited them only the week before. Following the unauthorized removal of the children from the State of Nebraska, Mrs. Strand was forced to go to St. Louis and regain custody by means of a habeas corpus proceeding. According to Mrs. Strand, after that incident the respondent did start calling the children on the phone, but did not ask for visitation. However, court-approved visitations apparently were held in the summer of 1980, Christmas of 1980, and the spring or summer of 1981.

Received in evidence as a part of the 1981 hearings was a written report from the Nebraska Psychiatric Institute, dated June 12, 1981. It indicated that there was an attachment by the children to both the grandparents and the father, that the children were doing well and would continue to do well in the grandparents' home, and would benefit from extended visitations with their father. A later report from NPI, dated August 21, 1981, revealed that the children seemed somewhat unhappy about a recently completed visitation in St. Louis with their father. The report, through the staff psychiatrist, concluded that the "boys would do well to continue living with their maternal grandparents, Mr. and Mrs. Strand," and that it would be best to send them to St. Louis for further visits only if they wanted to go, otherwise "for their father to come to Nebraska" for such visits.

In a January 1981 written report the medical director of the Fremont Mental Health Clinic, a licensed psychiatrist, ventured the opinion that the visitations with the father, by the older boy at least, were anxiety producing and had a negative effect on him. He stated in one report: "The visitation privileges granted the natural father by the court may be beneficial for the father but they are seen to be quite detrimental to this child and at the present time it is this facility's feeling that this child could benefit more by termination of such visits." During the course of this same witness' testimony at an April 1981 hearing, although he agreed that much of the negative feelings attributed to the boy as to his visits with his father came from the recitation of Mrs. Strand, he did not change his previous opinion. He did agree on cross-examination that the fact that the boy had been living with his grandmother for the last 6 years and was more or less forced to visit his father might have been one of the factors creating a separation anxiety disorder.

The guardian ad litem, who had been serving in

such capacity from August of 1980 until the October 1981 hearing, testified. He agreed that the respondent had been meeting his support obligations and would be considered a fit parent. He also ventured the opinion that although there may have been a question at one time as to whether it was the respondent or his mother who really wanted custody of the children, he now felt that the respondent truly did care about them and desired their custody. However, the guardian ad litem also stated that in his opinion the best interests of the children would be served by continuing to allow them to reside with the Strands. He based this on the August 21, 1981, report from the NPI staff psychiatrist, previously mentioned, on conversations with the boys as to their personal desires to remain with the grandparents, and because of the natural attachment which they had formed with the Strands through the circumstances of having lived with them all these years.

There is no evidence adversely reflecting upon the ability of the Strands to take care of these children, other than the fact that they are both in their mid-50s and are not the parents. An in-chambers interview with the children, conducted by the court with the approval of counsel, was not particularly startling. Both children indicated that they cared for both their grandparents and their father and, although they wanted to live with the grandparents, did want to visit with their father on occasion.

Based on the above record, the District Court in its findings reviewed the past delinquencies of the respondent as to child support and the two unauthorized efforts at self-help indulged in by the respondent regarding custody of the children. The court then concluded by pointing to the natural attachment that had developed between the children and their grandparents, made necessary because of the past actions of both the petitioner and the respondent, and found that the best interests of the children

would be served by maintaining custody with the Strands, within the jurisdiction of the court. It is this order which the respondent seeks to reverse as being contrary to the established law of Nebraska.

In support of his position, the respondent relies almost exclusively on *Nielsen v. Nielsen,* 207 Neb. 141, 296 N.W.2d 483 (1980). The majority opinion reviewed the prior authorities and stated the guiding principles in determining child custody to be: "Where the custody of a minor child is involved in a habeas corpus action, the custody of the child is to be determined by the best interests of the child, with due regard for the superior rights of a fit, proper, and suitable parent.

"The courts may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right.

"The right of a parent to the custody of his minor child is not lightly to be set aside in favor of more distant relatives or unrelated parties, and the courts may not deprive a parent of such custody unless he is shown to be unfit or to have forfeited his superior right to such custody." *Id.* at 149, 296 N.W.2d at 486.

As stated in the dissenting opinion of *Raymond v. Cotner,* 175 Neb. 158, 169, 120 N.W.2d 892, 898 (1963), "in order to permit the child to remain in an established and developed parental relationship with all that that imports," we will not be "forced to strain the evidence in order to find the blood parent 'unfit.' " However, we are not unmindful of the language in *Gray v. Hartman,* 181 Neb. 590, 595-96, 150 N.W.2d 120, 123 (1967), in which we said that "proper concern for the welfare of a child encompasses something more than dutiful adherence to a court's order as to financial support. . . . 'Children are not chattels,' and to entitle one to parental rights he must show something more than mere . indicia of title. . . . He appears now as an absolute stranger to

her, and under the guise of concern for her welfare, has no hesitation in seeking to uproot her at an age when she is approaching the threshold of adulthood. An effective . . . forfeiture of parental rights may be effected by the indifference of a parent for a child's welfare over a long period of time.''

Also, in *Haynes v. Haynes,* 205 Neb. 35, 39, 286 N.W.2d 108, 110 (1979), we said: ''While it is true that a parent has a natural right to the custody of his child, the court is not bound as a matter of law to restore a child to a parent under any and all circumstances. The welfare of a child of tender years is paramount to the wishes of the parent where it has formed a natural attachment for persons who have long been in the relation of parents with the parents' approval and consent.''

Although the respondent in the present case has not specifically approved or consented to the relationship which has developed between the children and their grandparents, he has, by his past conduct and defaults, not only permitted but practically demanded it. As such, we conclude that he has ''forfeited his superior right to such custody'' which he might otherwise have possessed, and the best interests of the children require that they remain in the custody of the Strands.

The District Court awarded the guardian ad litem the sum of $1,120 as fees and taxed the same to the respondent as costs of this action. The respondent does not complain of the amount of the fees, but only that it was all taxed to him.

The authority of the court to appoint a guardian ad litem to protect the interests of the minor children cannot seriously be questioned. Neb. Rev. Stat. §§ 38-114 and 42-358 (Reissue 1978). The power of the court to award fees for such guardian ad litem is a necessary incident to the power of appointment. The allowance of fees and costs is discretionary and depends upon a consideration of all the facts and circumstances. *Friedenbach v. Friedenbach,* 204 Neb.

586, 284 N.W.2d 285 (1979). Ordinarily, the successful party is entitled to an award for costs, and it necessarily follows in such cases that payment of the same will be taxed to the unsuccessful party. *Kasparek v. May,* 178 Neb. 425, 133 N.W.2d 614 (1965). We find no abuse of discretion by the trial court in taxing costs as it did.

The judgment of the District Court is affirmed.

AFFIRMED.

CLINTON, J., not participating.

WHITE, J., concurring.

I remain committed to the position taken in the dissent in *Haynes v. Haynes,* 205 Neb. 35, 286 N.W.2d 108 (1979). However, the conclusion that the father, by his conduct, has in fact abandoned the child is not an unreasonable one, and for that reason I concur in the judgment.

McCOWN and CAPORALE, JJ., join in this concurrence.